IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| vs. | ) | Criminal No. 09-303 |
| | ) | |
| OTTO HARRIS, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

AND NOW, this 9th day of November, 2010, upon consideration of Defendant's Motion to Suppress Evidence and Statements (Document No. 32) filed in the above-captioned matter on August 23, 2010, and upon consideration of the Government's response thereto, the September 29, 2010 hearing regarding Defendant's motion, and the parties' post-hearing briefs,

IT IS HEREBY ORDERED that said motion is DENIED.

AND, further, upon consideration of Defendant's Motion to Strike Attachment to Government's Response to Defendant's Post-Hearing Brief (Document No. 55) filed in the above-captioned matter on October 25, 2010,

IT IS HEREBY ORDERED that said motion is DENIED as moot.

Defendant, Otto Harris, is charged with possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e). The present motion seeks to suppress evidence and statements in this case based on alleged violations of Defendant's Fourth, Fifth, and Sixth Amendment rights.

1

On September 29, 2010, the Court held a hearing at which time testimony and evidence were presented in regard to Defendant's motion. The Government presented the testimony of two witnesses, Officer James Caterino and Michael Dziki. Defendant presented the testimony of Connie Acosta and offered several exhibits. On the basis of this evidence and the parties' filings, the Court finds no merit in regard to Defendant's arguments.

I. **Facts**

The record established the following facts: On June 1, 2009, shortly before 1:30 p.m., Officer James Caterino of the Munhall Police Department,[1] along with Mark Terry, a lieutenant with the local school district, were transporting a juvenile to Shuman Detention Center in a marked police vehicle, and, in the course of doing so, decided to stop to get the juvenile something to eat as they were driving through West Homestead. While at the intersection of Sarah Street and Eighth Avenue, Officer Caterino observed Defendant operating a green Ford Expedition traveling westbound on Eighth Avenue. Officer Caterino recognized Defendant immediately, as he was familiar with him from having executed a search warrant at his residence and arrested him on October 6, 2008.[2]

Believing Defendant to be driving without a valid driver's license, Officer Caterino

---

[1] Officer Caterino, who has been employed as a law enforcement officer for seven years, also works as a police officer for the Borough of West Homestead and the Borough of Braddock. He was, however, employed in his role as a Munhall officer at all times relevant here. Officer Caterino testified that the three boroughs have a mutual aid agreement allowing him to make arrests in one of the jurisdictions while on duty with one of the others.

[2] Defendant's girlfriend, Shayla Jones, was a passenger in Defendant's vehicle.

pulled behind Defendant's vehicle and contacted West Homestead police via his personal cell phone to request assistance in stopping Defendant's vehicle. Officer Caterino apparently was aware that Defendant did not have a valid driver's license from his encounter with Defendant in October of 2008. When he contacted the West Homestead police, he testified that he asked someone at the station to check the status of Defendant's license, but it is not clear from the record what response he received to his request.

Officer Caterino continued to wait for assistance while following Defendant down Eighth Avenue. However, once Defendant's vehicle approached the Carson Street exit, Officer Caterino activated his overhead lights, his siren, and his airhorn and attempted to effectuate a traffic stop.[3] However, Defendant refused to stop and continued onto Carson Street. It was also at around this time that Officer Caterino claims to have observed what he believed to be a rifle between the driver and passenger seats of Defendant's vehicle.[4]

Although Defendant generally drove at the posted speed, he illegally shifted lanes into oncoming traffic on Carson Street to pass other vehicles on four or five occasions, weaving in and out of traffic.[5] As Carson Street approaches the Becks Run Road

---

[3] Officer Caterino pursued Defendant for approximately 10 minutes before attempting to stop Defendant's vehicle.

[4] Defendant testified that the reason he attempted to stop Defendant's vehicle was his belief that Defendant was driving with a suspended license, not the fact that he believed Defendant had a gun.

[5] At that point, Carson Street has only one lane of traffic in each direction.

intersection, the road widens to include a left-hand turning lane to turn left onto Becks Run Road. When Defendant reached this point, he accelerated into the turning lane. Officer Caterino testified that he believed that Defendant was actually intending to go straight on Carson, using the left-hand turning lane as a way to place more vehicles between him and the pursuing police car. However, Carson Street had the red light at that intersection, and a van was making a left-hand turn, with the green light, onto Carson Street off of Becks Run Road. Defendant turned left to avoid the van, but was traveling too fast and lost control of his vehicle, which came to rest after hitting a utility pole.

After the accident, Officer Caterino pulled his vehicle behind Defendant's Ford Expedition, and stopped his car about a car length and a half back. Officer Caterino exited his vehicle and saw Defendant slide from the driver's seat to the passenger's seat of the Expedition. The officer then lost sight of Defendant for a few seconds while he ran to the front of Defendant's vehicle. Accordingly, Defendant had already exited the vehicle from the passenger's side by the time Officer Caterino saw him again. Officer Caterino, at that time, saw that Defendant was carrying an assault rifle. Defendant began to flee on foot with the firearm, and Officer Caterino pursued him, instructing him several times to stop and drop the weapon.

After about 30 yards, Officer Caterino observed Defendant throw the firearm he was carrying over an 8-foot stockade fence near the property of Page's Dairy. At that point, Officer Caterino deployed his taser. Defendant was incapacitated and fell to the ground, striking his face. Defendant did not respond to Officer Caterino's instructions to

show his hands, and the officer concluded that Defendant was unconscious. While Defendant was unconscious, Officer Caterino applied handcuffs and performed a pat-down search which revealed a 30-round magazine containing two .308 rounds and $300 on Defendant's person. Defendant regained consciousness after about 10-15 seconds.

Once Defendant was conscious, Officer Caterino got him to his feet and stated that he saw Defendant throw the gun, to which Defendant responded, what gun?[6] Officer Caterino continued to talk with Defendant, who appeared to be responsive. Defendant did not complain about dizziness, but did indicate that he felt that his head was bleeding. His balance and gait were not noticeably impaired.

By that time, several other police vehicles had arrived at the scene, as had an ambulance. Officer Caterino and Defendant met with Baldwin paramedic rescue technician Michael Dziki, who helped put Defendant in the back of the ambulance. Mr. Dziki also assessed Defendant and checked his mental status to see if he was conscious, alert, and oriented. Defendant answered Mr. Dziki's questions appropriately, and Mr. Dziki concluded that Defendant was indeed conscious, alert, and oriented.[7] Mr. Dziki also checked Defendant's pupils, which were normal and reactive. He also indicated in his report that Defendant denied any dizziness, nausea, or vomiting. In addition, he assessed and bandaged Defendant's head wound.

---

[6] Defendant made this comment after being taken into custody but before being Mirandized. The parties have not addressed the admissibility of this comment, and the Court will assume it is not at issue.

[7] Although Defendant was slightly confused about the date, Mr. Dziki explained that this means that he knew the day of the week, and month, and the year, but merely was slightly off on the calendar date.

Officer Caterino and Mr. Dziki traveled in the back of the ambulance with Defendant while he was transferred to UPMC Mercy Hospital. Officer Caterino testified that while in the back of the ambulance he read Defendant his Miranda rights verbally and asked Defendant if he fully understood those rights,[8] to which Defendant responded that he did. Officer Caterino did not, however, testify as to what he said verbatim to Defendant regarding the Miranda rights. In any event, Defendant agreed to speak with the officer and proceeded to make a statement that the gun was his and not his girlfriend's. They also discussed Defendant giving a written statement, which he apparently ultimately did not do, in exchange for Officer Caterino not charging Ms. Jones. Defendant, per protocol, was admitted at Mercy Hospital for 24 hours for precautionary reasons.

The firearm was subsequently recovered by Officer Miller of the West Homestead police and identified as a black CETME .308 assault rifle bearing serial number C56901, the firearm at issue in this case. Officer Miller recovered the firearm from behind the fence where it had been thrown shortly after Defendant had thrown it there, before Defendant was in the ambulance. When Officer Miller showed the firearm to Officer Caterino, Officer Caterino confirmed that it matched the gun he had seen in Defendant's hands.

## II. Discussion

Based on these facts, Defendant contends that this Court should suppress

---

[8] Officer Caterino did not have a card from which to read the Miranda rights, but rather, gave them from memory.

evidence and statements to law enforcement because Officer Caterino lacked probable cause or reasonable suspicion to stop his vehicle, because his statements were made in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and because the statements were fruit of the unlawful arrest of Defendant and the stop of his vehicle. The Government argues that the stop of Defendant's vehicle was constitutional because it was based on probable cause that Defendant was driving illegally, and that Defendant's statements should not be suppressed because they were made voluntarily and after he received and waived his Miranda rights. The Court agrees with the Government.

Ordinarily, a police officer may constitutionally stop the driver of a vehicle when the officer possesses reasonable suspicion, or, at the very least, probable cause, to believe that the driver has committed a traffic violation. See Whren v. United States, 517 U.S. 806 (1996); United States v. Delfin-Colina, 464 F.3d 392 (3d Cir. 2006).[9] Here, though, it is unclear whether Officer Caterino had such reasonable suspicion that Defendant was driving without a valid driver's license. His prior knowledge of Defendant's license suspension was nearly eight months old, and the record is unclear as to whether West Homestead police ever confirmed that Defendant's license was, indeed, suspended. See United States v. Laughrin, 438 F.3d 1245, 1247-48 (10th Cir. 2006).[10]

---

[9] In Delfin-Colina, the Third Circuit Court of Appeals joined with the Second, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits in finding that the holding in Whren had not altered the long-standing rule that mere reasonable suspicion is required to support a routine traffic stop under the Fourth Amendment.

[10] It should again be noted that Officer Caterino has at no time relied on his belief that Defendant had a firearm in his vehicle to justify the attempted traffic stop.

7

Regardless, for a criminal defendant to be seized, for purposes of the Fourth Amendment, police must apply physical force to the defendant, or, where force is absent, the defendant must submit to a show of police authority. "[I]f the police make a show of authority and the suspect does not submit, there is no seizure." United States v. Valentine, 232 F.3d 350, 358 (3d Cir. 2000) (citing California v. Hodari D., 499 U.S. 621 (1991); County of Sacramento v. Lewis, 523 U.S. 833, 845 n.7 (1998); Abraham v. Raso, 183 F.3d 279, 291 (3d Cir. 1999)). Here, Defendant clearly refused to submit to police authority by failing to stop when directed to by Officer Caterino. Not only did he fail to pull over his vehicle, even after he had crashed his vehicle, he fled from Officer Caterino on foot with an assault rifle. As such, it was not until he was stopped by force, i.e., tasered, that he was seized. By then, Officer Caterino had observed Defendant with the subject firearm and saw him throw it over a fence. Defendant therefore abandoned the firearm while being pursued and before he was seized, and it thus was not the fruit of a seizure. The case law is clear that such evidence is not barred by the Fourth Amendment. See Hodari D., 499 U.S. at 629; United States v. Wadley, 185 Fed. Appx. 137 (3d Cir. 2006). Cf United States v. Fulani, 368 F.3d 351, 354 (3d Cir. 2004) (Defendant forfeits privacy interest in property when he abandons it).

Furthermore, by the time Defendant was tasered, Officer Caterino had more than sufficient probable cause to seize him. Defendant had been driving very recklessly, weaving in and out of traffic, and had, indeed, wrecked his vehicle and fled from a police officer with a visible assault rifle. Officer Caterino was more than justified in seizing Defendant at that point. See Valentine, 232 at 359 ("[W]hat [the defendant] did after he

8

failed to comply with the police officers' orders can be considered in evaluating reasonable suspicion."). Therefore, the search incident to that seizure was proper, and the evidence obtained from that search is not barred by the Fourth Amendment. Accordingly, no evidence obtained prior to the tasering of Defendant is subject to suppression.

Defendant's statements are also not subject to suppression. Defendant argues that the Government failed to meet its burden of establishing that he was properly advised of his Miranda rights and that he knowingly waived those rights because Officer Caterino failed to testify as to the specific language he used in giving Miranda warnings to Defendant on June 1, 2009. The Government tacitly agrees, but tries to supplement the record with an affidavit from Officer Caterino setting forth the precise language used. The Court does not believe that the record needs to be supplemented, and will disregard the Caterino Affidavit,[11] because the Court disagrees with both parties and finds that the Government has met its burden.

The Court agrees with the parties that the Government does have the burden of proof, by a preponderance of the evidence, to establish that Defendant was properly advised of his Miranda rights and that he knowingly waived those rights. See Missouri v. Seibert, 542 U.S. 600, 609 n.1 (2004); Colorado v. Connelly, 479 U.S. 157, 168 (1986). However, the Supreme Court "has not dictated the words in which the essential information must be conveyed." Florida v. Powell, 130 S. Ct. 1195, 1204 (2010). Here,

---

[11] Because the Court will not consider this affidavit, the Defendant's motion to strike it is moot.

Defendant's argument for suppressing his statements was extremely broad and vague; essentially, he simply wanted to put the Government to its burden of proof. He has never alleged that the warnings he was given were faulty or inaccurate, or that they failed to convey the essential information of <u>Miranda</u>. The issue at the hearing, then, was whether Defendant had been Mirandized and whether he had knowingly waived those rights. At no point was the Government led to believe that Defendant was challenging the accuracy of the warnings given by Officer Caterino themselves.

Officer Caterino, while he did not testify as to his exact words to Defendant, testified that he verbally Mirandized Defendant, that he asked Defendant if he fully understood those rights, and that Defendant replied that he did. He specified that he read *all* of the <u>Miranda</u> rights to Defendant. Nothing in his testimony suggests that he did anything other than properly give warnings he had been giving for seven years as a law enforcement officer.[12] Defendant did not offer any evidence or testimony contradicting Officer Caterino's testimony or drawing into question whether the warnings had been properly given. In fact, there is nothing in the record at all that would draw Officer Caterino's testimony into question. Under these circumstances, the Government has met its burden of establishing that Defendant was properly advised of his <u>Miranda</u> rights and that he knowingly waived those rights.[13]

---

[12] Nor does it matter that the warnings were given from memory rather than read off of a card.

[13] Defendant makes only a very general argument that his statements were not voluntary, and adduced no evidence in support of this argument. Although it is undisputed that Defendant was briefly rendered unconscious after the taser was deployed and that he sustained a head injury, the Government presented evidence

## III. **Conclusion**

For all of the reasons set forth herein, the Court finds that the seizure of Defendant and search of his person were lawful under the Fourth Amendment, and that no evidence is subject to suppression under that amendment. Moreover, statements given by Defendant after he was taken into custody were voluntary and were given after he had been advised of, and waived, his <u>Miranda</u> rights. Therefore, Defendant's motion is denied in its entirety.

s/Alan N. Bloch
United States District Judge

ecf:         Counsel of record

---

which demonstrates that Defendant was cognizant, coherent, and aware of the circumstances at the time he gave the statements at issue. Moreover, the Government's evidence demonstrates that the questioning of Defendant was cordial and that, indeed, Officer Caterino and Defendant were on generally friendly terms. There is no evidence in the record that would demonstrate that Defendant's faculties were impaired to the point that it would render his statements involuntary or that Defendant's will was overborne by Officer Caterino. Accordingly, based on an assessment of the "totality of all the surrounding circumstances," including "both the characteristics of the accused and the details of the interrogation," the Court finds that Defendant's statements were voluntary. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973).